Sandra P. **RENFRO**, Plaintiff,

v.

**UNUM LIFE INSURANCE COMPANY OF AMERICA**, Defendant.

No. 3:95–cv–0210 (nonjury).

United States District Court, E.D. Tennessee.

Jan. 23, 1996.

Steven L. Williams, Burnstine, Watson & Williams, Knoxville, TN, for plaintiff.

W. Kyle Carpenter, Ton R. Dalton, Woolf, McClane, Bright, Allen & Carpenter, Knoxville, TN, for defendant.

## MEMORANDUM OPINION

JORDAN, District Judge.

This is a civil action governed by the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1001–1461 (ERISA). It is before the court for consideration of the defendant's motion for summary judgment [doc. 11]. The parties have fully briefed the issues presented [docs. 12, 14, and 16], and the defendant has filed its claim record [doc. 12, attachment]. The court finds that oral argument would not assist it in ruling on the defendant's motion.

The plaintiff's claim is for benefits under a group long-term disability insurance policy issued by the defendant to the plaintiff's employer, Overlook Center, Inc., for the benefit of the latter's employees. While the plaintiff Ms. Renfro was working as Overlook Center's Corporate Controller/Director of Financial Operations, she experienced a disability due to major depression, and the defendant paid disability benefits to her under the policy in issue for a period of 24 months. The plaintiff claims in this civil action that at the end of this 24–month period, she continued to suffer disability due to multiple causes and conditions, and that the defendant therefore is liable for continuing benefits under the policy and under ERISA law concerning employee welfare benefits.

The claim record filed by the defendant UNUM reveals the following. The plaintiff Ms. Renfro applied on May 19, 1991, for long-term disability benefits, on a form provided by UNUM. On this form, the plaintiff stated that she had first noticed her disabling symptoms, and was first treated for them, on June 17, 1989, and that she had been unable to work due to disability since April 25, 1991 [1]. In the space provided, she listed the following symptoms: "chronic headaches; sadness; crying; fatigue; concentration difficulty; chronic allergies; sleep disturbance."

In support of this application for benefits, M. Weninger, M.D., the plaintiff's treating psychiatrist, completed a form on which he listed his diagnosis as major depression, and stated that the plaintiff had become totally

---

**1.** April 25, 1991, is the date the plaintiff last worked, according to the completed employer's report of claim submitted with the plaintiff's May 19, 1991, claim.

disabled about April 23, 1991. Dr. Weninger stated that he was treating the plaintiff with psychotherapy and chemotherapy, and that the plaintiff might be able to attempt part-time work in two months. Dr. Weninger stated that the plaintiff was not a candidate for rehabilitation to return to her job, but that she might be rehabilitated to do other work, and that her present occupation might be modified to allow her to work in it.

In response to the defendant UNUM's request for more information, Dr. Weninger stated on a form provided by the defendant an axis I diagnosis of major depression, and an axis III diagnosis of "COPD [chronic obstructive pulmonary disease], chronic HA [headaches], obesity." In progress notes dictated on June 25, 1991, this physician described a long history of depression with chronic headaches, and noted the following concerning the plaintiff's medical history:

> She has some extensive other medical history, including endometriosis until a complete hysterectomy in 1981 and also she has (sic: had) a Morton's neurinoma in 1985 removed. She has multiple allergies and has had extensive allergy care over the years. She had Bell's palsy in 1984. She has had a hiatal hernia and has had recurrent gastric ulcers on three occasions. Her cholesterol is chronically elevated in the 260 range.

Dr. Weninger noted that in January 1990, he had assessed the plaintiff's problems at that point "as being chronic depression, multiple allergies, obesity, chronic headache, chronic obstructive pulmonary disease, and hyperlipidemia, and chronic multiple pain medicines." This physician described her headaches as "rather marked, profound," and concluded that he was not certain about what could be done to rehabilitate the plaintiff gainfully.

The defendant UNUM approved the plaintiff's application for long-term disability benefits, for a period beginning on July 25, 1991. In an August 15, 1991, letter advising the plaintiff of this decision, an UNUM disability benefit specialist advised that the defendant would periodically send supplementary claim forms for the purpose of obtaining continuing proof of disability, and wrote, "Benefits are payable as long as you continue to remain disabled as defined and meet all other provisions as outlined in the contract." An attachment to this letter stated the policy's mental illness limitation, which, with some exceptions, capped benefits for disability due to mental illness at 24 months of monthly benefit payments.

During this time period, the Social Security Administration determined that the plaintiff was disabled on April 24, 1991, for the purposes of the Social Security laws, and began to pay her monthly disability benefits beginning October 1991. Early in 1992, the defendant requested proof of continuing disability, and in response, Dr. Weninger completed a form showing his diagnosis as major depression, "COPD chronic HA's (sic), obesity," stated that his patient continued to be totally disabled, and stated concerning her progress since his last report that she was unchanged. In the space for remarks, Dr. Weninger wrote, "This lady is severely depressed + suffers chronic HA's (sic) + environmental triggered asthma. I do not think she will be returning to gainful employment."

In an accompanying February 26, 1992, letter, Dr. Weninger wrote that he had been unable to get the plaintiff free of headaches or to end her use of all abuse-potential substances, but that her depression had substantially improved while she had been away from the stress of her work environment. This physician reported extremely severe headaches of about two days' duration about four times per month, poor sleep with multiple interruptions, and a recent decrease in appetite. Dr. Weninger noted that in addition to the stress of her job, the plaintiff Ms. Renfro had experienced problems with her allergies in a closed work environment, but he disclaimed any expertise with respect to allergies.

In October 1992, Dr. Weninger reported "no real change" in the plaintiff's condition. On June 24, 1993, he reported that the plaintiff continued to experience chronic pain, frequent, recurrent and severe headaches, and chronic depression. Dr. Weninger wrote that it was "obvious" that the plaintiff had ongoing respiratory problems, and "that a significant part of her overall distress is re-

lated to her chronic allergies and respiratory difficulty." Dr. Weninger continued to believe that the plaintiff was disabled.

On May 7, 1993, Larry C. Brakebill, M.D., an internist, wrote to UNUM stating that he had been following the plaintiff, his patient, "with arthralgias, myalgias, weakness, hypercholesterolemia and other medical problems." This physician stated a suspicion that the plaintiff had lupus, and stated also that due to her symptoms and her severe problems with allergies, she would not be able to return to work. Dr. Brakebill wrote, "I certainly feel that with the significant problems that she has with allergies and asthma that (sic) there will be significant contradications (sic: contraindications) to her working because she is very sensitive to any type of perfumes or other items that are ubiquitous in the work place."

At the defendant's request, Dr. Brakebill sent to the defendant a copy of his records concerning the plaintiff, including his office visit records. These records show the following entry for December 1, 1992:

I discussed her disability with her and I feel from the medical standpoint due to her chemical sensitivity, she'll never be able to work in office work again. Even if she didn't have the psychiatric problems this would occur. I told her she should consider refiling for her disability with her insurance company. I'll be glad to help in any way that I can. Recheck 6 mos.

In a later (June 11, 1993) letter, Dr. Brakebill stated that Ms. Renfro had significant medical problems including very, very severe asthma, that she continued to be seen by her psychiatrist and by an allergist, and that she was in the process of undergoing a rheumatologic evaluation. Dr. Brakebill wrote that the plaintiff had developed fatigue and arthralgias, and that "I believe her original disability may have been secondary to her depression and anxiety, but [she] has had these other problems also and they have become much, much more severe."

On June 29, 1993, Dr. Brakebill wrote to the defendant UNUM in response to the latter's request for results of pulmonary function studies, chest x-rays, and blood gases studies. Dr. Brakebill reported that he had not performed any pulmonary function studies or studies of blood gases, and that the chest x-ray pictures of the plaintiff taken in his office were clear except for some increased air space. Dr. Brakebill offered to perform studies of the plaintiff's pulmonary function.

In a July 15, 1993, letter, Dr. Brakebill repeated his opinion that the plaintiff was disabled, and stated, "Her medical condition is debilitating because of her allergies and asthma. It is a combination of the two that significantly restricts her activities." Dr. Brakebill stated that he could not make a diagnosis of lupus at that time, "although [the plaintiff] has had a borderline anti-nuclear antibody test and we are still following that along." Dr. Brakebill recommended full evaluation of Ms. Renfro's pulmonary function and an evaluation by her allergist, if UNUM needed more information.

On September 8, 1993, Dr. Brakebill wrote to UNUM to report the results of the pulmonary function test which the defendant had requested. On these results, it is noted that the plaintiff had severe bronchospasms during testing. The summary of the test results by Bruce Henschen, M.D., states, "Mild obstructive airways disease with air trapping. Mildly reduced diffusion capacity possibly due to carboxyhemoglobinanemia. Significant response to bronchodilator in small airways only."

Barry W. Sunshine, D.C., a chiropractor, submitted a letter following his April 18, 1991, examination and treatment of the plaintiff Ms. Renfro. In this letter, Dr. Sunshine stated diagnoses of classical migraine, lumbosacral spondylosis without myelopathy, spina bifida in the cervical region, a corticoadrenal insufficiency, cervical radiculitis, Meniere's disease, allergic rhinitis due to pollen, and candidiasis and environmental illness. Dr. Sunshine stated an opinion that the plaintiff was unable to be employed gainfully due to the severity of her symptoms and the complexity of her conditions.

The plaintiff's allergist, Marek M. Pienkowski, M.D., Ph.D., wrote simply in a June 11, 1993, letter to whom it may concern that the plaintiff had been his patient since De-

cember 1989, and that "[s]he suffers from perennial allergic rhinitis, conjunctivitis and asthma. Her history is also suggestive of eustachian tube dysfunction." The defendant UNUM wrote to this physician requesting results of pulmonary function tests, chest x-rays, and blood gases studies to support his diagnoses. In response, Dr. Pienkowski sent results of blood tests and of a CT scan of the paranasal sinuses. The impression stated on the latter is "[s]mall nasal septal spur, otherwise negative."

In a July 22, 1993, letter (incorrectly dated as July 22, 1992), Dr. Pienkowski stated that the plaintiff Ms. Renfro suffered from immunodeficiency (hypogammaglobulinemia A) and associated chronic rhinitis and asthmatic bronchitis; that the immunodeficiency caused frequent infectious complications which were difficult to control without exacerbating her asthmatic condition; and that it would be in his opinion unethical to discontinue the plaintiff's medications for the purpose of a diagnostic pulmonary function study.

On June 9, 1993, the plaintiff's physical therapist, Linda Gouge, P.T., wrote that the plaintiff had been receiving out-patient physical therapy since September 1992; that the plaintiff's severe asthma problem prevented her from moving towards an endurance program, and that she therefore was not a candidate for a work-hardening or rehabilitation program; and that because of this and because of her allergic reactions and pain, the plaintiff would be unlikely to be able to perform any work other than part-time work in her home. Ms. Gouge offered to answer any specific questions about the plaintiff's musculoskeletal condition.

By a letter dated September 29, 1993, the defendant UNUM denied the plaintiff Ms. Renfro's claim for continuing long-term disability benefits. The disability benefit specialist who communicated this denial to the plaintiff wrote,

I have written out to Dr. Brakebill, Dr. Wringer (sic: Weninger) and Dr. Pienkowski (sic: Pienkowski) and have received there (sic: their) office notes and pulmonary function studies and have reviewed this with our staff physicians and nothing in any of these notes supports total disability from a physical standpoint. When your claim for disability was first approved, it was approved under another diagnosis and a 24 month limitation which was previously explained to you in a letter on 8/1/91. Clearly you were totally disabled at that time, however, the 24 months has expired. As I stated above, there is no medical evidence to support physical disability.

The plaintiff pursued an administrative appeal from this denial of her claim. In support of her claim, her former employer, Overlook Center, submitted a letter stating that because the plaintiff suffered from pain, fatigue, and impaired judgment resulting from her diseases and her medications, Ms. Renfro would not qualify as a candidate for her former position. Overlook Center also stated in its letter that it could not reasonably accommodate the plaintiff in an employment position, due to business necessity.

The plaintiff also submitted in support of her appeal a November 19, 1993, letter from Fred M. Furr, M.D., a physician practicing in the areas of chronic fatigue, allergy and environmental medicine, and weight loss, and a letter and report of examination by Patricia W. Lee, M.D., a specialist in pulmonary diseases. Dr. Furr reported that he had performed provocative testing with various chemicals, and that to insure that Ms. Renfro's breathing difficulty was not psychological or the product of malingering, he referred her to the pulmonologist, Dr. Lee. Dr. Furr reported that the provocative testing produced definite objective symptoms as well as subjective ones, and concluded that the plaintiff Ms. Renfro was disabled. Dr. Furr noted that such chemical sensitivity as he perceived in the plaintiff's case was classically an increasing problem, as the patient developed more antibodies causing more reactions. Dr. Furr wrote, "This lady is totally disabled for employment in a normal office. She possibly could do book work in an allergy-free, chemically-free (sic), person-free environment which is not a practical consideration."

Dr. Lee reported a finding of evidence of small airways disease which heightened in effect with the introduction of a normal concentration of perfume; Dr. Lee noted an increase in the plaintiff's upper airway noise

and dyspnea. She also noted that after pulmonary function testing, the plaintiff was treated with Proventil because she showed symptoms of shortness of breath and substernal chest pain. This pulmonologist recommended treatment with an inhaler, PH monitoring, possible use of a nasal inhaler, and evaluation by an otorhinolaryngologist using a direct laryngoscopy. Her assessment upon examination and testing of the plaintiff was:

1) Small airways disease with possible exacerbation of reactive airways disease with sinusitis/exposure to environmental allergens such as perfume.

2) Hypercholesterolemia.

3) Lupus like arthritis.

4) History of anxiety and depression.

On December 14, 1993, the defendant UNUM upheld its denial of the plaintiff's claim. The defendant noted in its letter that in denying the claim originally, it had relied on Dr. Brakebill's assessment that the plaintiff had the functional capacity to sit for four hours, to stand for two hours, to walk for two hours, to lift up to 25 pounds occasionally, and occasionally to bend and stoop. The defendant noted also that its consulting physician, having reviewed the claim file, had determined that the plaintiff's pulmonary function test result was normal, and that her asthma was not debilitating.

In denying the plaintiff's claim upon appeal, the defendant UNUM noted that Dr. Furr had indicated that the plaintiff could work in an allergy-free, chemical-free, and person-free environment. The defendant noted also that review by its medical department of the latest tests performed on the plaintiff indicated that the plaintiff could function if she avoided perfumes and used a bronchodilator.

On December 28, 1993, the defendant communicated to the plaintiff its decision to continue disability benefits payments under a reservation of rights. The claim file shows continuing review of the evidence submitted by the plaintiff. Upon a reviewing physician's recommendation, the defendant UNUM wrote to Dr. Furr to inquire whether the plaintiff had followed Dr. Lee's recommendations. Dr. Furr responded that the chemical propellant in an inhaler had made the plaintiff's condition worse, and so she had discontinued using it. Dr. Furr also reported that the plaintiff had visited an otorhinolaryngologist, who did not perform any further flow volume loop studies, and did not perform a laryngoscopy. Dr. Furr reiterated that chemically sensitive persons take several years to lose their sensitivities so as to enable them to work among the public.

Upon review of this letter, UNUM's reviewing physician noted the existence of a controversy whether Multiple Chemical Sensitivity Syndrome, as perceived by Dr. Furr, exists, and recommended an independent medical examination. The defendant arranged for the plaintiff to be examined by a board-certified allergist, Jeffrey Schlactus, M.D., who performed the examination and testing on June 2 and 10, 1994. In his June 24, 1994, letter report, Dr. Schlactus noted that the plaintiff had never undergone sinus or nasal surgery, that the April 1993 CT scan of her sinuses showed an essentially normal condition, and that the plaintiff had not received any allergy injections. Dr. Schlactus noted also that although Dr. Pienkowski had arranged immunotherapy for the plaintiff after positive allergy skin testing, such treatment had never been pursued.

Referring to Dr. Lee's earlier finding of a slight decrease in mid-expiratory flow rate, which he also found upon testing, Dr. Schlactus commented that this was consistent with a diagnosis of chronic asthma. This physician concluded, however, that the plaintiff's asthma was mild at best, noting that there was no documented clinical evidence of moderate or severe airways obstruction, and that a methacholine inhalation challenge test was negative for a significant degree of airways hyperresponsiveness. Dr. Schlactus labeled such hyperresponsiveness "the hallmark of asthma." Dr. Schlactus also commented that the plaintiff's asthmatic symptoms could be controlled with more thorough and aggressive management using an anti-inflammatory drug.

Dr. Schlactus wrote that the plaintiff's heightened state of irritability of her airways, and her experience of symptoms upon expo-

sure to airborne irritants and noxious fumes, were consistent with other cases of asthma with underlying allergic triggers. This physician added,

Dr. Fred Furr has made a diagnosis of multiple chemical allergy, but this syndrome is highly controversial and no evidence has been provided to substantiate the notion that Ms. Renfro has been immunologically sensitized to environmental chemicals. In fact, the American Medical Association Council on Scientific Affairs stated in 1992 that multiple chemical sensitivity should not be considered a recognized syndrome.

Ms. Renfro is obviously disabled in that she becomes markedly symptomatic if she leaves her home environment, and thus it would be difficult for her to participate in work outside her home. I do not believe however that this is as a result of true asthma and may well be functional.

The defendant UNUM issued its final decision in a July 15, 1994, letter upholding the denial of the plaintiff's claim. This civil action followed.

In addressing the defendant's motion for summary judgment, the court encounters a dispute between the parties concerning which standard of review applies to judicial review of the denial of benefits in this case. The plaintiff Ms. Renfro argues for *de novo* review under *Perry v. Simplicity Engineering, a Division of Lukens General Industries, Inc.*, 900 F.2d 963 (6th Cir.1990), under which the court would review the defendant UNUM's decision on the basis of the claim record only, without any deference or presumption of correctness given to the defendant's decision, "simply decid[ing] whether or not it agrees with the decision under review." *Id.* at 966. The defendant UNUM argues in opposition that this employee welfare benefit plan, the group disability insurance policy in issue, granted it discretion to construe the plan provisions and to judge the validity of claims for benefits, and that the court should therefore apply the more deferential reasonableness or "arbitrary and capricious" standard of review. *See Perry v. United Food and Commercial Workers District Unions 405 and 442*, 64 F.3d 238, 242 (6th Cir.1995);

*Johnson v. Eaton Corporation,* 970 F.2d 1569, 1571–72 (6th Cir.1992); and *Miller v. Metropolitan Life Insurance Company,* 925 F.2d 979, 983–84 (6th Cir.1991).

■ It is difficult to find in the plan language in this case the clear grant of discretionary authority which the defendant UNUM argues is there. The court recognizes that a finding of such authority does not depend on the plan's use of the word "discretionary" or any other "magic word." *Block v. Pitney Bowes Inc.,* 952 F.2d 1450, 1453 (D.C.Cir.1992) (*per* Ruth Bader Ginsburg, now Justice), *cited with approval in Johnson v. Eaton Corporation, supra,* 970 F.2d at 1572 n. 2. In *Miller, supra,* the plan language which the court held provided discretionary authority to determine disability was "on the basis of medical evidence satisfactory to the Insurance Company." 925 F.2d at 983–84. In *Johnson v. Eaton Corporation,* it was a combination of language granting the pension committee the powers and authority necessary to carry out the plan, language granting the committee rulemaking authority, and language providing that the committee's denial of a claim would constitute a final disposition under the plan. 970 F.2d at 1571–72.

In *Perry v. United Food and Commercial Workers District Unions 405 and 442, supra,* the plan language clearly granted discretionary authority, for it provided that the trustees have "discretionary authority to determine eligibility for benefits under the Plan to determine the level of and the type of benefits provided by the Plan, and to construe the terms of the Plan." 64 F.3d at 242. The Court of Appeals for the District of Columbia Circuit in *Block v. Pitney Bowes Inc.* found a grant of discretionary authority in language empowering a plan administrative committee to interpret and construe the plan and to determine all questions of eligibility and the status and rights of participants in the plan, and in language providing that the committee's decision would, to the extent not inconsistent with the plan, be final, conclusive and binding.

■ The defendant UNUM points to plan language which states that when UNUM re-

ceives proof of disability, the defendant will pay disability benefits after the end of an elimination period, and will continue to pay benefits during a period of disability if the participant provides proof, at the defendant's request and the participant's expense, of continued disability and regular attendance of a physician. The defendant points also to its right to require that a benefits claimant be examined by a health care professional and/or be interviewed by a representative of UNUM. Neither provision expressly or impliedly grants discretionary authority with respect to decisions on claims for disability benefits. It is difficult to conceive of a disability insurance policy without some language like that in the first clause on which the defendant relies. However, a final decision on this issue is unnecessary, for, as is stated below in this memorandum opinion, the court finds that even under the standard of *de novo* review, the defendant's decision in this case must be upheld.[2]

The court reaches this decision based on the medical evidence in the this plaintiff's claim file. A reasonable summary of this evidence may be stated as follows. Dr. Weninger's reports provide evidence of Ms. Renfro's mental disability only. While he stated secondary or tertiary diagnoses of chronic obstructive pulmonary disease, chronic headaches, and obesity, Dr. Weninger disclaimed any expertise concerning allergies.

Dr. Pienkowski stated diagnoses of perennial allergic rhinitis, conjunctivitis, immunodeficiency, and asthmatic bronchitis, but he did not state that the plaintiff was disabled due to these conditions. The result of a CT scan of the plaintiff's paranasal sinuses submitted by Dr. Pienkowski was negative for any abnormality other than a small nasal septal spur.

The opinions of Dr. Sunshine, the chiropractor, and of Ms. Gouge, the physical therapist, may be discounted. It is not clear that Dr. Sunshine possessed sufficient expertise to make a diagnosis of candidiasis, an infectious disease, or of environmental illness, even assuming that the latter is a recognized diagnosis. The plaintiff has not in this civil action contended that she is disabled due to any condition within the competence of chiropractic to diagnose or to treat, or due to any musculoskeletal condition. While Ms. Gouge found the plaintiff unable to participate fully in physical therapy due to an asthmatic condition and allergic reactions, this therapist could not have provided any clinical support (as opposed to the plaintiff's subjective complaints and manifested symptoms during therapy) for a finding of disabling asthma or allergies.

The letter from the plaintiff's former employer, Overlook Center, provides no medical evidence to support the plaintiff's claim. The statement in that letter that Ms. Renfro was disabled from assuming her former employment position was made on the basis of Overlook Center's "understanding" that the plaintiff suffered from pain, fatigue, and impaired judgment.

The health care professional who perhaps served most as an advocate in support of the plaintiff's claim was Dr. Brakebill. However, this physician did not make a definitive diagnosis of lupus, and his rating of the plaintiff's asthma as very, very severe is contradicted by the results of the clinical tests. As noted above, Dr. Brakebill did not himself perform any pulmonary function studies, and the

---

2. For this reason, this court is not required to decide in this case whether the Court of Appeals for the Sixth Circuit might adopt the reasoning in *Pierre v. Connecticut General Life Insurance Company/Life Insurance Company of North America,* 932 F.2d 1552 (5th Cir.), *cert. denied,* 502 U.S. 973, 112 S.Ct. 453, 116 L.Ed.2d 470 (1991). In *Pierre,* the Court of Appeals for the Fifth Circuit held that even where the standard of *de novo* review mandated by *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), applies, factual determinations by a plan administrator are reviewed under an abuse-of-discretion standard. One district judge in this judicial district has expressly

declined to follow *Pierre. See Reynolds v. Massachusetts Casualty Insurance Company,* 900 F.Supp. 915, 924 n. 8 (E.D.Tenn.1995) (*per* Collier, USDJ).

In applying the *de novo* standard of review in this case, the court is not unaware of the conflict of interest inherent in the defendant UNUM's dual status as plan administrator and as the underwriter of the group policy of disability insurance which constitutes the plan. *See Bruch, supra,* 489 U.S. at 115, 109 S.Ct. at 956–57. The court finds that in this case, this factor does not outweigh the evidence in the claim file which supports the defendant's denial of the plaintiff's claim.

chest x-ray pictures made of the plaintiff in his office were unremarkable. While Dr. Brakebill, an internist, stated an opinion that the plaintiff's allergies contributed to her disabilities, the plaintiff was at the time under the care of an allergist, Dr. Pienkowski, who did not so state.

The pulmonary function test results delivered by Dr. Henschen to Dr. Brakebill showed only mild obstructive airways disease. The test results delivered by Dr. Lee to Dr. Furr indicated small airways disease with possible exacerbation caused by sinusitis or exposure to allergens, but Dr. Lee's recommendations—an inhaler, PH monitoring, perhaps a nasal inhaler, and a laryngoscopy—do not indicate a finding that the plaintiff was disabled. Regardless of any controversy concerning the legitimacy of the diagnosis of multiple chemical allergy made by Dr. Furr, his finding of disability must be discounted because he overstated Dr. Lee's findings on which he relied. As for disabling allergies, as opposed to asthma, Dr. Schlactus' comment, apart from his questioning of the legitimacy of the diagnosis of multiple chemical allergy, that "no evidence has been provided to substantiate the notion that Ms. Renfro has been immunologically sensitized to environmental chemicals" is true.

The plaintiff states in her affidavit submitted in opposition to the defendant's motion for summary judgment [doc. 14, ex. 1] that the results of Dr. Schlactus' testing of her are not in the claim file, and offers hearsay testimony concerning what Dr. Schlactus told her, as well as hearsay testimony concerning others' statements concerning her alleged total disability. This affidavit testimony overlooks the fact that this court's review under ERISA of the defendant's denial of the plaintiff's benefits claim, whatever the applicable standard of review, is limited to review based on the claim record before the plan administrator, and that this record includes the report of Dr. Schlactus described above.

As for the plaintiff's list of the various diagnoses made of her conditions during 1991 through 1993, the issue before the plan administrator was, as it is before this court, whether any condition or combination of conditions suffered by the plaintiff is disabling within the meaning of the applicable plan language. A list of diagnosed conditions, standing alone, does not satisfy the burden of making such a showing of disability.

Also in her affidavit in opposition to the motion for summary judgment, the plaintiff states that while she was made aware by the defendant, when her claim for benefits was first approved, of the plan's 24–month limitation applicable to mental health disabilities, she believes that this limitation was not in the plan when she first applied for benefits. The plaintiff points to an error made on the coverage summary card concerning the existence of the 24–month limitation in the plan. However, the defendant has shown through uncontroverted affidavit evidence [see doc. 16, ex. A] that the plan contained this limitation as early as December 1, 1988. The plaintiff could not have relied on any variance between the policy and the coverage summary card, nor has she attempted to make any showing that she did so rely.

The court therefore finds that the plaintiff's burden, at the end of the period during which she was paid disability benefits on the basis of the evidence provided by Dr. Weninger, was to establish that she was disabled due to a condition or combination of conditions other than a mental condition such as depression. This she failed to do. Ms. Renfro argues now that her disability was never subject to the 24–month limitation, because the defendant UNUM, in reviewing Dr. Weninger's finding of disability, singled out depression as the cause, when in fact this psychiatrist found the totality of his patient's conditions disabling. This misconstrues Dr. Weninger's records and reports. Dr. Weninger found the plaintiff's depression disabling. Neither he nor any other health care provider ever stated to UNUM that the plaintiff's obesity is disabling. Dr. Weninger's statement that the plaintiff suffered from chronic obstructive pulmonary disease must be judged in the light of the clinical evidence in this record concerning the plaintiff's pulmonary function. Dr. Weninger disclaimed any expertise as an allergist.

While the defendant, in considering Dr. Brakebill's assessment of the plaintiff, seems to have overlooked or ignored the fact that this physician judged the plaintiff capable of sitting for four hours *with rests,* standing for two hours *with rests,* and walking for two hours *with rests,* this physician's conclusion

of total disability was, as the court has discussed above, undermined by the absence of confirming clinical evidence. While the plaintiff attacks Dr. Schlactus' testing procedures as inconsistent with the American Medical Association Guides to the Evaluation of Permanent Impairment, this is a matter for expert evidence, which the plaintiff did not offer. In any event, other clinical evidence in this claim record, provided by other physicians, fully supports Dr. Schlactus' independent medical evaluation of the plaintiff.

In this case, the court finds that the defendant UNUM, on the basis of an independent medical evaluation and other clinical evidence in the claim record, properly found the plaintiff Ms. Renfro's asthmatic and allergic symptoms functional. The defendant therefore properly determined that the plaintiff was not disabled (other than disabled due to mental illness) under the applicable plan language. This decision renders it unnecessary to decide whether a claim for disability benefits based on an alleged disability caused by multiple chemical sensitivity is ever payable under an ERISA plan. *Compare Donato v. Metropolitan Life Insurance Company*, 19 F.3d 375 (7th Cir.1994).

For the reasons stated, the court will grant the defendant's motion for summary judgment, and dismiss this civil action.